FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 25 2017

JAMES W. McCORMACK, CLERK
By:_____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DINA DAHDAL, M.D.                                                                PLAINTIFF

CASE NO. 4:17-cv-478-BSM

TREMAYNE PEARSON, and WILLIAM GILLIAM
individually and in their official capacity for
LITTLE ROCK WASTEWATER UTILITY,
BRITTANY GODFREY, BYRON HARPER, OFC. SILVA,
individually and in their official capacities as
police officers for the city of Little Rock,
CITY OF LITTLE ROCK,
PULASKI COUNTY SHERIFF'S OFFICE and
UNITED PAIN CARE, LTD                                                        DEFENDANTS

This case assigned to District Judge Miller
and to Magistrate Judge Ray

## COMPLAINT-COUNT ONE CIVIL RIGHTS

1. This is a civil rights action for compensatory and punitive damages brought pursuant to 42 USC 1983 and 1988, under the Second, Fourth, Fifth, Eighth, and 14th Amendments to the United States Constitution, the Constitution of Arkansas, the Arkansas Civil Rights Act of 1983 codified at A.C.A. 16-123-101 *et seq*. and the common-law of the State of Arkansas against all named defendants except United Pain Care, LTD which is dealt with in count two. At all times relevant to count one plaintiff was a resident of Pulaski County, Arkansas. All acts alleged have occurred in the City of Little Rock, Pulaski County, Arkansas. All individual defendants are employees of the City of Little Rock, Arkansas. Pulaski County Sheriff's Office is the entity which runs the jail, and the website posting pictures of arrestees.

2. This court has jurisdiction over the parties and subject matter.

3. On August 19, 2014, Little Rock Police Department Defendant officers Godfrey and Harper approached Dr. Dahdal and Ms. Doe's home at 32 Flag Road, Little Rock, Arkansas and knocked on their front door. Plaintiff answered the door; the officers asked if she had witnessed an alleged altercation. Plaintiff truthfully answered, "No". The officers began to aggressively and leadingly question Ms. Doe about an alleged altercation to which Ms. Doe truthfully denied. The officers

continued the badgering of both Dr. Dahdal and Ms. Doe including asking plaintiff if she rented or owned her single family home. Plaintiff then requested the officers badge numbers and advised Ms. Doe that she had the right to remain silent and have a lawyer present, whereupon officer Godfrey threatened plaintiff with taking her to jail proclaiming, "Now listen here, you keep this up and I'll take you to jail". Dr. Dahdal inquired as to what the proposed offense was and the officer responded for obstructing governmental operations. Officer Harper placed his hand on his gun. Plaintiff told him this was interpreted as a threatening gesture and he took his hand off. Dr. Dahdal clearly re-stated "I do not consent to any further questioning or a search" as Godfrey put her leg inside the door to hold the door open then lunged at Dr. Dahdal, grabbing her left arm and right arm at which time Harper bent over, grabbed her by both ankles and pulled them from underneath plaintiff causing plaintiff to fall onto Ms. Doe who was behind her and caused Godfrey to fall down. This enraged Godfrey and she repeatedly kicked plaintiff with her boot. The officers tackled, then dragged plaintiff out of her house, rolled her face down onto concrete at the arrival of numerous reinforcement vehicles including officer Silva who jumped onto plaintiff while Harper handcuffed her behind her back. Silva took plaintiff to Harper's police car and locked her inside. LRPD officers were excessively forceful in extracting plaintiff from her home. These actions caused significant injuries to plaintiff's arms, legs and torso. The officers were armed and their questions as they took Dr. Dahdal into custody from her home constituted custodial interrogation. Plaintiff was never told she was under arrest or for what offense and was never Mirandized. From the back seat of the police vehicle plaintiff saw officers enter her home and disappear into it for an extended period of time. Plaintiff was incarcerated overnight and the next day resulting in one missed day of University of Arkansas for Medical Sciences Physical Medicine and Rehabilitation resident physician obligation at Central Arkansas Veterans Healthcare System.

4. Pearson and Gilliam were at all times acting within the scope of their employment for Little Rock Wastewater Utility, an agency of the City of Little Rock. Defendant Pearson gave false accusations against Ms. Doe to his superiors and called the police. Pearson reportedly told the Defendant officers

that "the blond", i.e. Ms. Doe had assaulted him. Defendant Pearson declined to press charges to police and informed a witness; Mr. David Kaufman, J.D. who is plaintiff's next door neighbor residing at 30 Flag Road, Little Rock, Arkansas, of such decision at the scene. Defendant Pearson stated to police "the brunette", i.e. plaintiff, was not present or involved during the alleged incident of Ms. Doe making physical contact with Pearson. Police officers arrived after the alleged incident and had no other reasonable suspicion or probable cause to enter the plaintiff's home without a warrant, then interrogate, batter, and arrest plaintiff. Plaintiff was served an *ex parte* no contact order against Pearson which would not have been done without the officers' false statements of an altercation between Ms. Doe and Pearson and false statements about Dr. Dahdal. The *ex parte* no contact order prohibited plaintiff from possessing or purchasing a firearm or other weapon for one year's duration, thereby violating Dr. Dahdal's Second Amendment right.

5. Defendant William Gilliam supported Defendant Pearson's lies to police and his supervisor and was named in the *ex parte* no contact order against Plaintiff.

6. At the preliminary hearing in Little Rock District Court the District Judge dismissed all charges against plaintiff and Ms. Doe. Defendants Godfrey, Harper and Silva violated Dr. Dahdal's Fourth Amendment right to be free from frivolous arrest on nonexistent facts by wrongfully arresting her, falsely charging her with battery, assaulting her, searching her home, writing a fictitious police report and causing excess publicity of the arrest on the internet which has never been taken off the internet despite objections and complaints by plaintiff. As a matter of office policy, Pulaski County Sheriff's Office publishes mugshots and details of arrests on the internet but refuses to remove the picture from public domain after charges are dismissed which has dire consequences on the lives of citizens. Pulaski County Sheriff's Office further refused to remove the mugshot from public posting even after plaintiff's arrest record was officially sealed by court order, and after being asked to do so by plaintiff, so the internet states to the world that plaintiff was arrested without the clarification that she was acquitted. There was no justification for the defendants to inflict this terrorizing behavior upon the body and

reputation of a physician who is an outstanding citizen of the community, in the otherwise peaceful Briarwood neighborhood on a sunny Tuesday early afternoon. Plaintiff was physically injured and was grievously injured by the publication to the world of the charges without an explanation that she was acquitted. Because of that internet publication and the impact of a violent false charge such as battery in the third degree on patient trust she was terminated from a position which was to have paid her $925,000 dollars and defendants are liable to her for that sum.

7. As a proximate result of the actions of defendants, plaintiff suffered physical pain and suffering, temporary disfigurement, emotional stress, damage to reputation and financial losses for which plaintiff should be compensated by the defendants in an amount exceeding the jurisdictional limit for diversity cases in federal district court.

8. Defendant officers knew when they committed these wrongful acts upon the plaintiffs that LRPD officer Donna Lesher had shot and killed Eugene Ellison while he was unarmed in his home without probable cause and knew that the City of Little Rock had not fired Lesher, arrested Lesher or disciplined her so that the City of Little Rock established by this failure to act that the intentional constitutional violations of citizen's rights by Little Rock police officers was official policy of the City of Little Rock.

9. The defendants acted willfully with malice intentionally entitling the plaintiff to punitive damages against them in an amount exceeding the jurisdictional limit for diversity cases in federal district court plus attorney's fees and costs.

## COUNT TWO – BREACH OF CONTRACT

10. Plaintiff is now a resident of the state of California. Defendant United Pain Care, LTD is a resident of the state of Arkansas so that there is complete diversity of jurisdiction. The matter in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. 1332. This court has jurisdiction of the parties and the subject matter.

11. Plaintiff and defendant United Pain Care, LTD are parties to a contract attached hereto as **Exhibit**

1, which provided that defendant was hiring plaintiff for three years at the rate of $300,000 per year with a $25,000 sign-up bonus.

12. However, because of the arrest referred to in count one of this complaint defendant United Pain Care refused to employ plaintiff and therefore owes plaintiff $900,000 plus $25,000. Plaintiff's arrest for obstruction of governmental operation was not a defense to the contract and is not grounds for termination of the contract.

WHEREFORE, plaintiff prays for damages against all defendants in count one for compensatory and punitive damages in amounts exceeding the jurisdictional level of this court and in count two for the sum of $900,000.00 plus $25,000 sign-up bonus for a total of $925,000.00 plus attorneys fees, costs and all other proper relief.

R. David Lewis 68030
Attorney for plaintiff
1109 Kavanaugh Blvd.
Little Rock, Arkansas 72205
501-664-0818
501-664-3884 Facsimile
rdavidlewis@yahoo.com

## VERIFICATION AND AFFIDAVIT

State of Arkansas )
                  ) SS
County of Pulaski )

I, Dina Dahdal, M.D. after being duly sworn, on oath, state, according to the best of my knowledge, information and belief, that the allegations and statements contained in the foregoing complaint are true and correct.

_____
Dina Dahdal, M.D.

Subscribed and sworn to, before me, a Notary Public, this ___14___ day of July, 2017.

_____
NOTARY PUBLIC

My commission expires: ___5-15-20___

IN GOD WE TRUST

★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

UNITED PAIN CARE

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT**, effective the 1st day of July, 2016 is entered into between United Pain Care, Ltd (the "Employer") and Dina E. Dahdal, M.D. ("Employee").

W I T N E S S E T H

WHEREAS, the Employer provides the services of physicians licensed to practice medicine in the State of Arkansas; and

WHEREAS, the United Anesthesia Associates, P.A. is the sole contracted provider of Pain Medicine services at United Pain Care, Ltd at 7481 Warden Road, Sherwood, AR 72120; and

WHEREAS, the Employee desires to practice medicine as an employee of the Employer; and

WHEREAS, Employee is licensed in the State of Arkansas to practice medicine, and is a trained in the field of Physical Medicine and Rehabilitation; and

WHEREAS, the Employer and Employee have determined a reasonable formula for the compensation of Employee, and the Employer has offered employment on the basis of such compensation formula and benefits hereinafter set forth, and Employee is willing to accept employment on such terms and abide by the terms of this agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, Employer hereby employs Employee and Employee accepts employment upon the following terms and conditions:

1. **EMPLOYMENT; DUTIES; TERM AND OBLIGATIONS OF EMPLOYEE**

    1.1. <u>HOURS:</u> Employer hereby employs Physician and Physician agrees to be employed by the Employer for 8 hours a day, forty (40) hours per week.

    1.2. <u>STANDARD OF CARE:</u> Employee shall provide services at a level of competence commensurate with acceptable medical professional standards and to the best of Employee's ability. Employee agrees to devote sufficient and necessary time, attention, and skill to the performance of duties as an employee of the Employer as is reasonably required by



Case 4:17-cv-00478-BSM Document 1 Filed 07/25/17 Page 8 of 18
Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 2 of 12

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

the Employer. The Employee shall do no act in contradiction of the ethical standards established by the American Medical Association.

1.3. <u>MALPRACTICE POLICY:</u> Employee shall, at all times, maintain in good standing her license to practice medicine in the State of Arkansas; shall obtain and maintain, in good standing, membership to the medical staffs of hospitals serviced by Employer; and maintain eligibility for professional liability insurance coverage with claim limits in the minimum amount of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate as required by the Employer consistent with other physician-employees of the Employer.

1.4. <u>MALPRACTICE CLAIM:</u> The Employee and the Employer mutually agree to work together in defense of any malpractice claim, against either party or both parties, alleged to have occurred during the term of the Employee's employment. The parties agree to promptly notify their respective malpractice insurance carriers and the other party of any claim, or of the existence of a potential claim, of malpractice at such time as the party becomes aware of the existence of such claim or potential claim. The parties agree to work together to provide all necessary information and cooperate with their respective insurance companies in the defense of any claim, including, but not limited to, providing all records, files, information, memorandums, and other information about the claimant, potential claimant, and his or her case history.

1.5. <u>TAIL CCOVERAGE:</u> In the event of termination of this Agreement, whether voluntarily or involuntarily, Employer shall immediately purchase continuing endorsement ("tail") professional liability insurance in amount of One million dollars ($1,000,000) per claim and three million dollars ($3,000,000) per yearly aggregate, or such other amount as may be required by Arkansas State Medical Board statute, whichever is greater. Employer agrees to maintain this insurance in force until all applicable statutes of limitation have run to protect the Employer from financial loss with respect to any claim against the Employer that could be covered by such insurance.

1.6. <u>EXCLUSIVITY:</u> During the term of this Agreement, Employee agrees not to render professional services to any other party other than Employer except with expressed

Case 4:17-cv-00478-BSM   Document 1   Filed 07/25/17   Page 9 of 18
Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 3 of 12

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

permission if the moonlighting work will not affect performance with the employer.

1.7. ASSIGNMENTS: The relationship between Employer and Employee is the same as that of other professionals on the staff of the Employer, i.e., that of any employer and employee subject to the National and State Canons or Rules of Ethics. The Employer shall have the sole right to determine the assignment of patients to Employee and Employee shall render proper services to such patients. Employee shall abide by and act in accordance with any and all policies, rules, procedures, and instructions established by the Employer; including, but not limited to those relating to patient assignment, acceptance, and rejection, charging of fees, participation on hospital staffs and in various insurance entities such as HMO's, PPO's, IPA's and other similar organizations. The Employee shall confer with the Employer and the other physicians of Employer to periodically review patient matters in order to assure the highest possible level of patient care and professional practice.

1.8. PATIENT SOLICITATION: It is understood that all patients treated by the Employee are patients of the Employer. Employee may not solicit any patient or prospective patient of Employer, it being expressly understood that the Employer shall have the sole authority to determine which employees of the Employer shall perform professional services for any particular patient of the Employer.

1.9. RECORDS: Employee shall promptly prepare and file any medical records, business records, or other reports that the Employer may from time to time require.

1.10. FEES AND CHARGES: Employee shall charge all patients of the Employer for professional services performed during the term of this Agreement in accordance with the fee schedules and policies established by the Employer, and to regard all charges for said professional services as property of the Employer.

1.11. PRIOR CONSENT: Employee shall not execute any contract on behalf of the Employer without the prior consent of the Employer.

Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 4 of 12

**Deleted:** March 25, 2016
**Inserted:** March 25, 2016
**Deleted:** March 15, 2016

1.12.   CONTINUING MEDICAL EDUCATION (CME): Employee agrees to maintain membership in appropriate professional societies and organizations and to attend a sufficient number of CME professional meetings to maintain skills and meet requirements for licensure in Arkansas.

2. **OBLIGATIONS OF EMPLOYER**: During the term of this Agreement, the Employer shall:

   2.1.   FACILITY: Provide the necessary office facilities, equipment, supplies, and personnel to enable the Employee to perform the duties hereunder;

   2.2.   ALLOCATION: Direct, control and supervise the duties and work of the Employee.  The Employer shall have the sole and exclusive right to allocate the patients among its employees with due regard to the source of the patient, the specialty and skill of the employees and the workload of the employees;

   2.3.   SALARY: Pay a yearly guaranteed salary of three hundred thousand dollars  ($300,000 ) during the first year. Salary will be computed monthly and paid within seven days following the close of accounting for the previous month.  Such payments shall be subject to reduction for all applicable employment taxes, including income taxes, social security, and Medicare tax as applicable under Federal and State laws.

   2.4.   INCENTIVE PAYMENT: Provide an incentive payment  above the guaranteed salary based upon Employee's productivity and efficiency. Employee shall receive sixty percent (60%) of the income for services performed beyond 150 encounter units (EU) a week defined as follows, which shall be renegotiated after completion of the first year;
   2.4.1.   Evaluation and Management (E&M) of 15 min for follow up (1 EU) and new patients for 30 min (2 EU)
   2.4.2.   Fluoroscopic and non-fluoroscopic procedures such as ultrasound guided trigger point and joint injections are usually performed in conjunction with the follow up visit which would then be about 30 min (1 + 1 EU);
   2.4.3.   This incentive shall be paid monthly (after 90 days for collection, meaning, January incentive payment will be paid in May).

   2.5.   Signing Bonus. Pay a one time signing bonus in the amount of twenty five thousand dollars ($25,000) which

Case 4:17-cv-00478-BSM Document 1 Filed 07/25/17 Page 11 of 18
Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 5 of 12

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

shall be paid during normal payroll over the first 3 months of employment.

2.6. COMPLIANCE: Provide urine drug testing facility for monitoring patient compliance on controlled substances and screening from illicit substances according to current clinic Urine Drug Testing policies.

2.7. PRESCRIBING: Prescribe according to current clinic guidelines for pill quantity limits for non-cancer pain and non-controlled adjuvant medications to manage pain. No post-dated prescriptions to be issued. No prescriptions authorized over the phone unless under exceptional circumstances with a note in the patient chart describing the circumstances.

2.8. MEDICAL MALPRACTICE: Provide medical malpractice insurance coverage.

2.9. HEALTH INSURANCE: Provide health insurance reimbursement to the employee and immediate family up to $500 per month. The insurance reimbursement amount may change according to clinic policy for all physicians.

2.10. PAID TIME OFF: Allow Employee to take twenty (20) workdays as vacation time and five (5) workdays to attend professional meetings provided Employer is given sufficient advance notice of the Employee's intent to be temporarily away. Such vacations or absences from work shall be limited to the extent that there is no material adverse impact on the operation of the business, and approved by the Employer two (2) months in advance. The Employee shall be entitled to six (6) paid holidays each year. All leaves will be pro-rated. Paid maternity leave will be covered after three (3) years of employment.

2.11. PROFESSIONAL ALLOWANCE: Reimburse the Employee for the costs of computer equipment, software, professional organization memberships, subscriptions, journals, and meeting expenses, subject to a yearly limit of eight thousand five hundred dollars ($8,500). The amount will be pro-rated for part of the year.

2.12. PARTNERSHIP: The employee will be eligible to purchase shares in the practice after 90 days of employment. The employee can set aside pre-tax income towards the purchase of practice shares. After 1 year of employment, the

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

employee can incrementally obtain shares without purchasing based on further negotiated salaries and value provided to the practice.

3. **COMMENCEMENT AND TERMINATION OF AGREEMENT:** The term of this Agreement shall be from August 15, 2016 until August 14, 2019 unless sooner terminated upon occurrence of the following:

   3.1.  Upon the death of the Employee; or

   3.2.  After sixty (60) days prior written notice by either party; or

   3.3.  Upon delivery of written notice of any substantial breach of any material obligation of either Employee or Employer set forth in section I or II above, provided such written notice shall specify the provision of this Agreement that has been breached and after allowing ten (10) calendar days for the breaching party to cure such breach; or

   3.4.  Employee is found by any governmental agency or court to have violated federal or state labor or civil rights laws, including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended, the Americans With Disabilities Act, and the Arkansas Civil Rights Act; or

   3.5.  Immediately upon the Employee's commission of:
      3.5.1.  a felony; or
      3.5.2.  any act of fraud, misappropriation, embezzlement, willful misconduct by any professional board, institution, organization or professional society or willful violation of any material obligation of this Agreement; or
      3.5.3.  failure to maintain licensure in Arkansas, failure to maintain hospital staff privileges, or failure to maintain eligibility for malpractice insurance coverage; or
      3.5.4.  If the Employee is unable to carry on her duties by reason of physical or mental disability and be deemed disabled. Upon Employee's disability for a consecutive period of thirty(30) days the Employee shall receive her regular monthly salary. If the disability continues for more than one (1) month, the Employee shall be entitled to no further compensation; or
      3.5.5.  The employee shall fail or refuse to comply with the policies, standards and regulations of the Employer

Case 4:17-cv-00478-BSM   Document 1   Filed 07/25/17   Page 13 of 18
Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 7 of 12

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

      to the satisfaction of the Board of Directors, provided that no such termination shall occur hereunder until the Employer shall have delivered a written notice to the Employee describing the failure and such failure is not cured to the Employer's satisfaction within a period of ten (10) days following receipt of such notice; provided that the Employer shall not be required to provide more than two (2) such notices during any period of six (6) consecutive months; or

  3.5.6. If the Employee shall fail or refuse to faithfully or diligently perform the provisions of this Agreement or the usual and customary duties of her employment, provided that no such termination shall occur hereunder until the Employer shall have delivered a written notice to the Employee describing the failure and such failure is not cured to the Employer's satisfaction within a period often (10) days following receipt of such notice; and

3.6. Notwithstanding Employee's termination of employment pursuant to the above provisions of Article III, upon termination of employment the Employee shall:

  3.6.1. Deliver to Employer an immediate accounting of all property belonging to Employer in the possession of Employee; and

  3.6.2. Complete all records and reports reasonably required by Employer. All professional and business records, including all patients general charts and x-rays, remain the property of the Employer and shall not be removed from the office; and

  3.6.3. Refrain forthwith from representing to be an agent or employee of the Employer; and

  3.6.4. Receive any compensation due and owing for services properly performed under the terms of this Agreement prior to termination, less any amounts which the Employee owes to the Employer pursuant to this Agreement, and less any amount which the Employer may have the right to offset against the amount owed to Employee. The Employee shall continue to receive compensation following the termination of this Agreement, in accordance with Article II (B), with such payments of deferred compensation to be made monthly as patient insurance payments and patient receipts are collected, but in no event will such payments continue beyond one (1) year from the termination of this Agreement; and

Case 4:17-cv-00478-BSM Document 1 Filed 07/25/17 Page 14 of 18

Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 8 of 12

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

3.6.5. The Employer shall have the sole responsibility for notifying the public and the patients treated by the Employee of the Employee's termination of employment. The Employee shall assist the Employer to arrange for the reassignment of patients and use best efforts to assist the Employer to ensure the continued care of such patients. Notwithstanding the above provision, the Employee may publicize the new practice arrangement by and through any appropriate media.

3.7. NON-COMPETE: Should the Employee's employment with Employer for any reason end before the end of this Agreement period, Employee shall be prohibited from pain management services for any clinic or facility within Pulaski county for a period of six months, following the date of such termination.

## 4. MISCELLANEOUS

4.1. INCOME OF EMPLOYER: All income generated by the Employee for services as a physician shall belong to the Employer when performed during the time of the Employer.

4.2. ENTIRE AGREEMENT: This Agreement represents the entire agreement between the parties hereto and supersedes any and all other agreements, understandings, or expectations, either written or oral, whether or not communicated. Modification of this Agreement shall be valid only when in writing and signed by both the Employer and Employee.

4.3. REFERENCE: The article and other headings contained herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

4.4. BINDING: This Agreement shall be binding upon and inure to the benefit of the Employer and Employee and their respective heirs, legal representatives, executors, administrators, and successors in interest.

4.5. WAIVER OF BREACH. Waiver by the Employer of a breach of any provision of this Agreement by the Employee shall not operate or be construed as a waiver of any subsequent breach by the Employee.

4.6. RIGHTS: This Agreement and all rights, benefits, and obligations hereunder are personal to the Employee and the Employer and neither this Agreement, nor any right,

Case 4:17-cv-00478-BSM   Document 1   Filed 07/25/17   Page 15 of 18
Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 9 of 12

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

benefit, nor any obligation hereunder, shall be voluntarily or involuntarily sold, transferred, or assigned.

4.7.  SEPERABLE: The provisions of this Agreement are separable. If any one or more of the provisions of this Agreement are held to be invalid for any reason by any court of competent jurisdiction, or are voided or nullified for any reason including a finding that any provision violates ethical opinions or practice restrictions of licensing boards or medical associations having jurisdiction over the parties, the remaining provisions shall continue in full force and effect and shall be binding on the parties as nearly as possible.

4.8.  NOTICES: All notices hereunder shall be given in writing by hand delivery or by certified mail to the following addresses:

   Employer: 7481 Warden Road, Sherwood, AR 72120

   Employee: 32 Flag Road, Little Rock, AR 72205

   Any notice given pursuant to this paragraph shall be deemed given on the date of hand delivery or as of five (5) days after the date of mailing. Either party may change its address for notice purposes.

4.9.  WAIVER: The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, nor be construed as, a waiver of any subsequent breach or violation hereof. No waiver of any provision shall be valid unless made in writing and signed by the party for whose benefit the provision exists.

4.10. ACCOUNTING: All computations required under this Agreement shall be determined from the books and records of the Employer by its independent accountant or accounting firm retained by the Employer. Absent manifest error, the calculations and determinations made by the accountant or accounting firm shall be conclusive and binding on all the parties.

4.11. APPLICABLE LAW: This agreement has been executed and delivered in, and shall be construed and enforced in accordance with the laws of the State of Arkansas.

Case 4:17-cv-00478-BSM Document 1 Filed 07/25/17 Page 16 of 18
Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 10 of 12

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

4.12. <u>INTELLECTUAL PROPERTY:</u> The Employee acknowledges that valuable and confidential information about Employer's business practices may be obtained during the course of the employment and that the unauthorized disclosure of such information would harm Employer. Therefore, the Employee shall not disclose, without prior written consent of the Employer, any information relating to the Employer's operations to any person(s) other than: (a) the Employer's employees or other professionals retained by the Employer to provide services to it; (b) state licensing boards; (c) third-party payors but only with regard to patient charges; and (d) governmental agencies (but only if served a valid subpoena).

4.13. <u>TRADE SECRETS:</u> Employee acknowledges that during the term of this Agreement. Employee will, directly and indirectly, learn of or be involved in many confidential matters, items, and information as well as certain trade secrets and other information considered or defined as a proprietary of "trade secret" under the Arkansas Theft of Trade Secrets Act or the federal theft of trade secrets act, (hereinafter collectively referred to as the "Confidential Information") which Employee hereby covenants to keep and maintain confidential within the Employer, both during the term of this Agreement. Excepted from the foregoing shall be the disclosure of any Confidential Information which (a) Employee is directed to disclose by the Board of Directors of the Employer provided such is undertaken in performance of Employee's normal and customary duties, (b) is or becomes generally available to the public other than as a result of an unauthorized disclosure by Employee, and (c) Employee is directed to disclose by a court or governmental agency, provided Employee shall have notified the Employer as soon as practicable following receipt of notice from a court or governmental agency in this regard. Provided, that the foregoing prohibition shall not extend to any patient, and any information maintained by the Employer with respect to such patient, who has voluntarily requested the transfer of his or her medical records to the Employee following the Employee's termination for any reason whatsoever.

4.14. <u>PROPERTY:</u> Upon termination of employment, and regardless of the reason for such termination, Employee will turn over or return to the Employer on the date of the termination, all documents or records, files, notebooks, handbooks, computers, disks or other materials, including,

UNITED PAIN CARE, LTD.

Case 4:17-cv-00478-BSM Document 1 Filed 07/25/17 Page 17 of 18

Employment Agreement: United Pain Care - Dina Dahdal
July 14, 2017
Page 11 of 12

Deleted: March 25, 2016
Inserted: March 25, 2016
Deleted: March 15, 2016

but not limited to, all copies in her possession or control which contain Confidential Information of the Employer or any other information concerning the Employer, its patients, customers, referral sources or vendors.

4.15. TRAINING AND SUPERVISION: The employee will observe, train and be supervised for interventional spine procedures after completing an interventional cadaver course.

4.16. CONFIDENTIALITY/HIPAA COMPLIANCE: The parties agree that this Agreement and its provisions are strictly confidential. The parties shall not disclose any information pertaining to any provision of this Agreement to any person or entity not a party to this Agreement except for tax, legal, or accounting advisors or as otherwise required by law. Unless otherwise permitted by applicable law, each party to this Agreement will not use or disclose certain confidential, proprietary, and nonpublic financial and other information concerning patients ("Protected Health Information") in violation of the requirements of 45 CFR Section 165.504 and 164.506(e)1, known as the Health Insurance Portability and Accountability Act of 1996, Privacy and Security Standards ("HIPAA"), which are incorporated herein by reference. Each party agrees to use their best efforts to comply with HIPAA in all respects including the implementation of all necessary safeguards to prevent such disclosure and the assurance that any entity to whom either party provided Protected Health Information agree to the same restrictions and conditions imposed on the parties hereto under HIPAA.

4.17. LEGAL ACTION: In the event any legal action, special proceeding, arbitration, or other action is commenced by either Employee or Employer to determine rights or obligations created by this Agreement, the prevailing party shall be reimbursed by the other party for all costs incurred by the prevailing party in the proceeding, including, but not limited to, all expenses allowable under statute and reasonable attorneys' fees.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

EMPLOYER: _____
Mahmood Ahmad, MD
President,
United Pain Care, Ltd

UNITED PAIN CARE, LTD.

Employment Agreement: United Pain Care - Dina Dahdal
3/25/2016
Page 12 of 12

EMPLOYEE: _____  3/25/16
Dina E. Dahdal, M.D.

WITNESS: _____

*Mahmood Ahmad* (signature)

Mahmood Ahmad, MD

3/26/2016

UNITED PAIN CARE, LTD.